Joseph L. Friedman and Henrietta K. Friedman v. Commissioner.
Friedman v. Commissioner
Docket No. 1031-66.
United States Tax Court
T.C. Memo 1968-145; 1968 Tax Ct. Memo LEXIS 153; 27 T.C.M. (CCH) 714; T.C.M. (RIA) 68145; July 10, 1968, Filed John Kennedy Lynch, 907 The East Ohio Bldg$, Cleveland, Ohio, for the petitioners. Larry L. Nameroff, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies and additions to tax against the petitioners, as follows: Year
Deficiency
Additions to tax Sec.6653(b) [1]
1956
$20,183.73
$10,091.87
1957
6,622.89
3,311.45
1958
3,238.79
1,619.40
1959
4,352.40
2,176.20
1960
$ 6,449.20
$ 3,224.60
1961
17,956.10
8,978.05
1962
8,698.75
4,349.38
1963
3,628.63
Both parties have made certain concessions which can be given effect in the Rule 50 computation. *154 The following issues remain for decision: (1) Whether petitioners failed to report all taxable income received by them during the years 1956 through 1962 resulting in deficiencies in their Federal income tax for those years; (2) whether any part of the underpayment for each of the years 1956 through 1962 was due to fraud with intent to evade tax; (3) whether assessment of any deficiencies determined for the years 1956, 1957 and 1958 is barred by the statute of limitations; and (4) whether for the year 1963 petitioners understated their dividend income by $1,219.20 and their interest income by $1,257.71. Findings of Fact Joseph L. Friedman and Henrietta K. Friedman (herein called petitioners) are husband and wife whose residence at the time they filed their petition in this proceeding was in Shaker Heights, Ohio. They filed their joint Federal income tax returns for the calendar years 1956 through 1963 with the district director of internal revenue at Cleveland, Ohio. Joseph L. Friedman (herein called Joseph) was one of five children born to Max and Mary Friedman, who immigrated to this country from Poland in 1905 or 1906. The family settled in Cleveland, Ohio, where Max Friedman *155 earned a livelihood by peddling fruits and vegetables and by dealing in scrap metals. Mary Friedman was an intelligent and energetic woman who, in addition to caring for her family, earned money by baking, catering, making wine and by selling dry goods door-to-door. The family occupied a series of residences during the period prior to 1940, some of which they rented and some they owned. For a period of about five years they owned a building in which they occupied one suite and rented two other suites on the second floor and three stores on the first floor. The Friedman family lived comfortably, but not lavishly, during this period. Neither Max nor Mary Friedman had a bank account, but both regularly carried currency on their persons. Joseph was the youngest son and was the favorite. His parents paid for his medical education, and he began the practice of medicine in 1938. Max Friedman worked continuously until incapacitated by an illness in 1952 which resulted in his death in the same year. Shortly before he died, he turned over to Joseph a white cardboard box, measuring about two feet in width and length and one foot in depth, which contained a large amount of cash. The box was *156 taken by Joseph to his office where his secretary assisted him in counting the bundles of bills. According to the secretary's count, the bills totaled $42,000. Joseph placed the bundles back in the box and took the box to his home where it was secreted in a cedar chest. In the fall of 1955, Joseph and his family moved to a new home. In the process of moving, Harold Arsham assisted Joseph in transferring the cedar chest to the new residence. Arsham was shown the white box, and he observed that it was filled with bundles of bills. Max Firedman died intestate on August 12, 1952. His estate consisted solely of a parcel of real estate valued at $6,000 which was subject to a mortgage with a $1,350 balance. Other debts, expenses, and obligations of the estate totaled $4,257.70. After the death of her husband, Mary Friedman lived alone in the same house and continued to work as she had always done until her health began to fail in 1962. In the fall of 1963 she suffered a stroke and, after hospitalization, was placed in a home for the aged. At the time of the stroke, Joseph discovered $1,000 in bills concealed on his mother's person. Mary Friedman was declared mentally incompetent on *157 January 20, 1964 and Joseph was appointed her guardian. No personal property was included in an inventory, dated June 3, 1964, of her guardianship estate. Mary Friedman died on December 25, 1964. Neither Max nor Mary Friedman filed any Federal income or Federal gift tax returns for the years 1940 through 1962. Joseph and Henrietta Friedman (herein called Henrietta) have two daughters, Carol, born on February 28, 1940, and Jane, born on December 7, 1944. In 1947 it was discovered that Jane was mentally retarded. Samuel Kluga, Henrietta's father and a wealthy businessman, was concerned about Jane's 716 condition. In 1947 he began giving sums to Joseph, which averaged $250 a month, for Jane's care. Samuel Kluga died in 1956 leaving an estate of over $100,000 to his wife, Telsa. Telsa Kluga contracted Parkinson's disease but during 1963 was mentally competent and was able to care for herself. As of the date of trial, Telsa Kluga was confined to a hospital in very ill health. Neither Samuel nor Telsa Kluga filed any Federal gift tax returns for the years 1940 through 1962. During the period from 1945 through 1955, Joseph suffered from an ulcer condition which severely limited *158 his practice of medicine. He normally spent only two hours a day at his office and, occasionally, did not work at all. He had a few surgical cases but did not make daily hospital rounds. During this time he underwent a serious stomach operation. Joseph charged $3 for an average office call, less than the amount charged by any other doctor sharing the same office. From 1960 through 1963 Joseph worked regular office hours, 9:00 a.m. to 5:00 p.m., for an average of 5 days per week. His income increased during 1962 as a result of the institution that year of the flu vaccination and the Pap smear testing programs and his appointment as acting director of gynecology and obstetrics at Polyclinic Hospital, which resulted in increased surgical and consultation work. Joseph's secretaries maintained an appointment book and an accounts receivable ledger. The appointment book recorded the name and address of each patient indicating the time and date of her appointment, but no entries were made in it by the secretaries indicating charges or payments on accounts. Appointment books for the years prior to 1959 were not available to revenue agents because they had been destroyed by Joseph. The 1961 *159 appointment book was given to the agent initiating the investigation of petitioner's returns who made an adding machine tape of dollar figures which appeared at the bottom of each page. The total of these figures was $24,861; Joseph reported total receipts from his medical practice in 1961 of $24,927. Joseph's secretary, who made daily entries in the 1961 appointment book, did not observe any dollar figures on any of the pages in the book. When the revenue agent to whom the 1961 appointment book was given left the case, he returned it to the attorney retained by petitioners at that time. Petitioners could not produce the book at trial; the attorney who received it was no longer retained by them and had no recollection of the whereabouts of the book. The accounts receivable ledger was used to record amounts due for services rendered to patients who did not pay on the date of their office call. Joseph opened his own mail and, when checks were sent by patients, he would inform his secretary to make appropriate entries in the looseleaf pages. Ledger sheets were periodically discarded by Joseph or his secretary when a patient died or discontinued visits. Ledger sheets for years prior *160 to 1959 had been destroyed and were unavailable at trial. No permanent record was kept of cash payments made at the time of the office calls. When such payment was made, the secretary would place it in the back of the appointment book, give a receipt to the patient, and make a notation of the patient's name and the amount of payment on a note pad. Slips from the note pad were given to Joseph at the end of each day and were eventually discarded by him. Joseph regularly deposited checks received from patients and insurance companies in his bank accounts. He did not deposit cash receipts but retained them to cover personal living expenses and for use as petty cash in his office. Business records for the year 1962 belonging to Joseph and to another doctor who share the same office were inadvertently destroyed by an office cleaning woman who mistook them for trash. On their 1962 Federal income tax return petitioners reported their business receipts solely upon the basis of bank deposits made in that year. Upon request by revenue agents for all petitioners' cancelled checks for the years in issue, about half of all checks listed on petitioner's bank statements for the years 1959 through *161 1962 were given to the agents. Total deposits to one of petitioners' checking accounts at the Central National Bank of Cleveland, Ohio, for the years 1959 through 1962 and total business receipts reported during these years were as follows: Year
Total Deposits
Gross ReceiptsReported
1959
$29,308.78
$21,143.00
1960
26,369.88
22, 622.00
1961
30,900.55
24,927.00
1962
30,212.50
31,851.09 717 Joseph prepared without assistance all Federal income tax returns filed jointly with Henrietta. He also prepared income tax returns for his daughters and his father-in-law. Neither Joseph nor Henrietta filed any Federal gift tax returns for the years 1940 through 1962. Since 1944, petitioners have owned and maintained a safe deposit box at the Central National Bank of Cleveland, Ohio, in which they keep their valuable papers. During the period from 1955 through 1962, petitioners had the following bank accounts with their daughters: one checking account and 12 savings accounts at 9 savings institutions in the form of joint or trusteeship accounts for Carol M. Friedman, and 10 savings accounts at 10 savings institutions in the form of trusteeship accounts *162 for Jane E. Friedman. The balances in these accounts on December 31 of each of the years 1955 through 1962 were as follows: Year
Carol M.Friedman
Jane E.Friedman
Total
1955
$ 216.57
$ 1,177.16
$ 1,393.73
1956
683.72
1,212.71
1,896.43
1957
706.02
2,261.41
2,967.43
1958 3,586.70
11,686.94
15,273.64
1959
3,753.74
12,129.22
15,882.96
1960
3,339.30
6,075.37
9,414.67
1961
11,441.30
23,121.34
34,562.64
1962
23,372.94
31,239.67
54,612.61
Petitioners made deposits to and withdrawals from all these bank accounts and had custody of the savings passbooks to all savings accounts. Checks from Joseph's patients and from insurance companies for professional services performed by him were deposited in these accounts. Joseph owned jointly with Mary Friedman or as trustee for her 11 savings accounts at 10 savings institutions which had the following yearly balances: Year
Amount
1955
1956
$ 33,281.45
1957
33,310.82
1958
37,279.46
1959
39,517.63
1960
40,382.97
1961
45,036.39
1962
31,311.35
Joseph had custody of the passbooks and made all deposits to and withdrawals from these savings accounts. Joseph deposited *163 in the accounts personal checks from patients and from other sources. On April 2, 1957, he withdrew $3,900 from one of the accounts to pay the purchase price of a new Cadillac. In addition, he withdrew a total of $6,683.25 in 1956 and $6,650 in 1960 to purchase shares of stock in his own name as custodian for either Jane or Carol Friedman. The joint accounts with Mary Friedman were opened by Joseph during the year 1956. None of the accounts were reported to the probate court in Mary Friedman's guardianship proceedings in 1964. In July 1962, 11 of the joint or custodial accounts were closed by Joseph who used the funds and $520.20 to open 4 new accounts. The transaction had the following effect: Closed
Opened
Increase(Decrease)
Petitioners' joint accounts
$ 6,222.99
$10,000.00
$ 3,777.01
Accounts bearing Carol Friedman's name
1,620.87
10,847.81
9,226.94
Accounts bearing Jane Friedman's name
7,147.42
10,000.00
2,852.58
Accounts bearing Mary Friedman's name
25,336.33
10,000.00
(15,336.33)
Total deposits to the savings accounts bearing the names of Carol Friedman, Jane Friedman, or Mary Friedman for the years 1956 through 1962 (excluding *164 change of account number redeposits and inter-account transfers) were as follows: Carol Friedman
Jane Friedman
Mary Friedman
1956
$ 455.00
$38,580.00
1957
$ 1,000.00
4,290.00
1958
2,683.39
9,300.00
3,354.10
1959
150.00
791.39
1960
430.63
2,297.26
1961
7,860.72
16,690.12
3,240.00
1962 1,700.00
4,209.75
Totals
$13,279.74
$31,199.87
$52,552.75
At least $2,405.89 of the deposits made by petitioner to At least $2,405.89 of the deposits made by petitioner to trusteeship accounts for Jane E. Friedman during 1961 and $3,583.44 of the deposits made in 1962 consisted of checks from Joseph's patients. During 1963, interest of $4,795.65 was credited to the savings accounts listed above in which one of petitioners had at least part ownership. On their joint Federal income tax return for 1963 petitioners reported interest income of $3,537.94. On their 1963 individual Federal income tax returns, Carol M. Friedman and Jane E. Friedman reported interest income of $17.20 and $15.35, respectively. Joseph used cash receipts from his medical practice to purchase official bank checks and money orders which were used to purchase stock *165 and to pay insurance bills, 718 education expenses and taxes. At Joseph's request, the checks and money orders occasionally bore the name of Mary, Jane or Carol Friedman as "remitter." In 1954 petitioners secured from National City Bank of Cleveland, Ohio, a commitment for a $35,000 construction loan for a new residence. The entire commitment was not needed, however, because Joseph regularly deposited his own funds to the construction loan account. Prior to December 31, 1955, he deposited $33,049.61, and the bank advanced $15,200; after that date he deposited $4,430.76, and the bank advanced $4,232.20. On September 29, 1955, petitioners repaid $15,000 of the advances, leaving a $200 balance in the account. The entire obligation was satisfied on May 3, 1957. Since the death of his father, Joseph has made $60 monthly payments for the support of his mother and, occasionally, has paid her utility and mortgage obligations. On March 4, 1964, he petitioned, as guardian of Mary Friedman's estate, the Cuyahoga County Probate Court to sell the sole asset of the guardianship estate, a parcel of real estate, in order to obtain funds to pay the debts and obligations of the estate. Included *166 among the obligations was a mortgage indebtedness of $446.98, arising from a mortgage dated April 17, 1934. In 1940 Mary Friedman applied for an extension of time for making payments on the mortgage. On December 31, 1955, petitioners owned individually or jointly the following shares of stock: Company
Number of shares
Cost basis
Gunnar Mines Ltd
20
$ 211.80
A.C.F. Wrigley Stores, Inc
300
4,294.89
AT&T
21
3,095.00
Motorola, Inc.
15
652.56
Hazeltine Corporation
20
508.75
Admiral Corporation
24
635.06
R.C.A.
30
834.94
Subsequently, petitioners purchased the following securities: Year
Company
Number of Shares
Cost basis
1956
Consolidated Denison
100
$2,098.87
1956
Jones & Laughlin Steel Corp.[1]
100
[4] 5,680.79
1956
Beneficial Standard Life Insurance Company [2]
100
[4] 3,683.25
1957
Mohasco Industries
300
3,201.30
1957
Rockwin Mines
500
712.66
1957
Hydrocarbon Chemical
500
1,413.90
1957
Chromalloy
35
303.65
1957
Jones & Laughlin Steel Corp.[1]
100
5,092.55
1959
Lazard Fund, Inc.
500
[4] 8,610.30
1960
Forest City Enterprises
60
600.00
1960
National Bellas Hess, Inc. [1]
300
[4] 3,581.40
1960
B.S.F. Company [2]
500
[4] 9,012.30
1960
Lazard Funds, Inc. [2]
200
[4] 3,048.12
1960
Glen Alden
200
[4] 3,655.59
1960
Bobbie Brooks, Inc.[3]
300
[4] 8,825.78
1961
Work Wear Company
50
750.00
1961
AT&T
4
344.00
1961
Rusco Industries [2]
2,000
[4] 6,943.80
1961
Helicoil Corporation [2]
100
4,013.88
1961
Vance, Sanders and Company [2]
200
4,710.50
1962
Putman Growth Fund
5
42.05
1962
Far West Financial Corporation [2]
100
3,162.50
1962
Diner's Club [1]
200
[4] 4,104.51
*167 All securities owned or purchased by petitioners which appear in the above list were held by them from the date of purchase through December 31, 1962, except the following: Company
Number of Shares
Year Sold
Chromalloy
35
1958
Mohasco Industries
300
1959
Rockwin Mines
500
1960
Hydrocarbon Chemical
500
1960
Bobbie Brooks, Inc
300
1961
Glen Alden
200
1961
Rusco Industries
700
1962
Petitioners made all purchases and sales of the above-listed securities, had custody of the stock certificates, and received and deposited in their checking account all dividends paid on the securities during all the years in issue. 719 During 1963 dividends of $1,812.56 were earned on the shares of stock listed above. On their joint Federal income tax return for 1963, petitioners reported dividend income of $593.36. Carol M. Friedman and Jane E. Friedman reported, on their individual 1963 Federal income tax *168 returns, dividend income of $535.75 and $683.45, respectively. Petitioners held in their own names or jointly with Jane E. or Carol M. Friedman United States savings bonds which had a cost basis as of December 31 of the years 1955 through 1962 as follows: 1955
$ 34,281.25
1956
33,281.25
1957
33,281.25
1958
27,675.00
1959
19,500.00
1960
15,000.00
1961
15,000.00
1962
15,000.00
Respondent has determined the deficiencies in petitioners' Federal income tax for the years 1956 through 1962 by the net worth method as follows: 12/31/55
12/31/56
12/31/57
12/31/58
Assets:
Cash on hand
$ 5,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
Petitioners' bank accounts:
In petitioners' names only
6,891.67
7,842.36
6,779.76
19,073.94
Bearing the name of Carol M. Friedman
216.57
683.72
706.02
3,586.70
Bearing the name of Jane E. Friedman
1,177.16
1,212.71
2,261.14
11,686.94
Bearing the name of Mary Friedman
33,281.45
33,310.82
37,279.46
Corporation securities
10,233.00
18,724.64
29,448.70
29,145.05
U.S. Government savings bonds
34,281.25
33,281.25
33,281.25
27,675.00
County Club Assn., Inc. bond
500.00
500.00
500.00
500.00
Investment - Kilroy
14,397.47
3,385.40
Cemetery lots
Loan receivable (Mary Friedman)
2,000.00
2,000.00
2,000.00
2,000.00
Loan receivable (Estate of Max Friedman)
4,257.70
4,257.70
4,257.70
4,257.70
Real estate, Ohlman Avenue
800.00
800.00
800.00
800.00
Real estate, Shaker Heights
5,140.22
5,140.22
5,140.22
5,140.22
Residential improvements
48,249.61
56,912.57
56,912.57
56,912.57
Automobiles
10,762.08
10,762.08
10,694.51
10,879.76
Home furnishings
3,000.00
3,000.00
3,000.00
3,000.00
Office furnishings
725.00
725.00
725.00
725.00
Surgical equipment 550.00
550.00
550.00
550.00
Total assets $133,784.26
$180,673.70
$205,765.16
$217,597.74
Liabilities - mortgage on residence
$ 200.00
$ 2,803.75
Reserves for depreciation 1,263.89
2,180.28
$ 1,993.60
$ 3,384.70
Total liabilities and reserves $ 1,463.89
$ 4,984.03
$ 1,993.60
$ 3,384.70
Net worth
$132,320.37
$175,689.67
$203,771.56
$214,213.04
Prior year's net worth 132,320.37
175,689.67
203,771.56
Increase in net worth $ 43,369.30
$ 28,081.89
$ 10,441.48
*169 12/31/59
12/31/60
12/31/61
12/31/62
Assets:
Cash on hand
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
Petitioners' bank accounts:
In petitioners' names only
29,011.36
25,803.82
26,957.58
35,919.45
Bearing the name of Carol M. Friedman
3,753.74
3,339.30
11,441.30
23,372.94
Bearing the name of Jane E. Friedman
12,129.22
6,075.37
23,121.34
31,239.67
Bearing the name of Mary Friedman
39,517.63
40,382.97
45,036.39
31,311.35
Corporation securities
34,554.05
61,150.68
65,431.49
73,195.11
U.S. Government savings bonds
19,500.00
15,000.00
15,000.00
15,000.00
Country Club Assn., Inc. bond
500.00
500.00
500.00
500.00
Investment - Kilroy
1,309.84
603.95
953.50
2,945.49
Cemetery lots
100.00
200.00
375.00
Loan receivable (Mary Friedman)
2,000.00
2,000.00
2,000.00
2,000.00
Loan receivable (Estate of Max Friedman)
4,257.70
4,257.70
4,257.70
4,257.70
Real estate, Ohlman Avenue
800.00
800.00
800.00
800.00
Real estate, Shaker Heights
5,140.22
5,140.22
5,140.22
5,140.22
Residential improvements
56,912.57
56,912.57
56,912.57
56,912.57
Automobiles
11,121.64
10,421.06
10,440.08
10,563.34
Home furnishings
$ 3,000.00
$ 3,000.00
$ 3,000.00
$ 3,000.00
Office furnishings
725.00
725.00
725.00
725.00
Surgical equipment
550.00
550.00
550.00
550.00
Total assets $225,782.97
$237,762.64
$273,467.17
$298,807.84
Liabilities - mortgage on residence
Reserves for depreciation $ 2,245.32
$ 3,578.14
$ 3,685.17
$ 5,035.26
Total liabilities and reserves $ 2,245.32
$ 3,578.14
$ 3,685.17
$ 5,035.26
Net worth
$233,537.65
$234,184.50
$269,782.00
$293,772.58
Prior year's net worth 214,213.04
223,537.65
234,184.50
269,782.30
Increase in net worth $ 9,324.61
$ 10,646.85
$ 35,597.50
$ 23,990.288
*170 720 12-31-56
12-31-57
12-31-58
Increase in net worth
$43,369.30
$28,081.89
$10,441.48
Additions to net worth
13,770.16
15,446.18
19,736.51
Deductions from net worth
(50.00)
(12,347.89)
(6,267.08)
Adjusted gross income
$57,089.46
$31,180.18
$23,910.91
Less corrected itemized deductions 1,000.00
1,763.00
2,505.00
$56,089.46
$29,417.18
$21,405.91
Less exemptions 2,400.00
2,400.00
2,400.00
Taxable income
$53,689.46
$27,017.18
$19,005.91
Taxable income reported on return 10,555.00
7,067.00
8,090.00
Understatement of taxable income $43,134.46
$19,950.18
$10,915.91
12-31-59
12-31-60
12-31-61
12-31-62
Increase in net worth
$ 9,324.61
$10,646.85
$35,597.80
$23,990.28
Additions to net worth
20,355.59
23,925.20
24,685.89
25,924.15
Deductions from net worth
(2,099.31)
(2,673.29)
(6,259.60)
(7,399.78)
Adjusted gross income
$27,580.89
$31,898.76
$54,024.09
$42,514.65
Less corrected itemized deductions 2,032.00
1,991.00
2,145.90
2,338.19
$25,548.89
$29,907.76
$51,878.19
$40,176.46
Less exemptions 2,400.00
2,400.00
2,400.00
2,400.00
Taxable income
$23,148.89
$27,507.76
$49,478.19
$37,776.46
Taxable income reported on return 9,708.00
8,596.00
9,200.91
17,976.23
Understatement of taxable income $13,440.89
$18,911.76
$40,277.28
$19,800.23
*171 At the outset of the investigation of petitioners' Federal income tax returns, Joseph was confronted by a revenue agent with an alleged $12,000 or $13,000 discrepancy in taxable income reported for the year 1961. In response, Joseph explained that he had received $5,000 or $6,000 of that amount from his parents. At a later stage in the investigation when petitioners' returns for the taxable years 1959, 1960 and 1961 were being examined, Joseph asserted that petitioners' total cash accumulation was $20,000 to $25,000. In their petition, petitioners claim a cash hoard of at least $67,000 on December 31, 1955. Attempts were made by revenue agents to interview both Mary Friedman and Telsa Kluga in March 1964. At that time, petitioners' attorney informed the agents that Telsa Kluga was in California and would not return for two weeks, that she was approximately 80 years of age and suffered from Parkinson's disease, and that 721 he was opposed to any interview with her. Petitioners' attorney also informed the agents that Mary Friedman was in a nursing home and had been declared mentally incompetent. Ultimate Findings 1. Petitioners had inadequate and incomplete books and records *172 of their income producing activities for the years 1956 through 1962. 2. Prior to December 31, 1955, petitioners had received $42,000 in cash from Max Friedman and $27,000 from Samuel Kluga. Of the total cash accumulated ($69,000), petitioners spent the sum of $48,049.61 on the construction of their home at 3075 Morley Road, Shaker Heights, Ohio. On January 1, 1956, petitioners still had the amount of $20,950.39 cash on hand which had been accumulated in prior years. 3. For each of the years 1956 through 1962 a part of the underpayment of tax by the petitioners was due to fraud with intent to to evade tax, and each of their Federal income tax returns for those years was a false and fraudulent return with intent to evade tax. 4. For the year 1963 the petitioners omitted dividend income of $1,219.20 and interest income of $1,257.71. Opinion Issue 1 - Determinations of Taxable Income In the absence of adequate books and records, respondent was justified in determining petitioners' tax liabilities for the years 1956 through 1962 by the net worth plus nondeductible expenditures method. See Holland v. United States, 348 U.S. 121 (1954); Cefalu v. Commissioner, 276 F. 2d 122 *173 (C.A. 5, 1960); and Morris Lipsitz, 21 T.C. 917 (1954), affirmed 220 F. 2d 871 (C.A. 4, 1955). Petitioners did not argue at trial or on brief that use of the net worth method was unjustified under the facts of this case; nor have they contested respondent's determination of nondeductible expenditures for any of the years. Petitioners' principal argument is that the burden of proving the deficiencies for each of the years 1956 through 1962 has shifted to respondent because his net worth statement is arbitrary, thus overturning the presumption of correctness which attaches to his determinations. Citing cases such as Fuller v. Commissioner, 313 F. 2d 73 (C.A. 6, 1963); Phillips' Estate v. Commissioner, 246 F 2d 209 (C.A. 5, 1957); and Gurbb v. Commissioner, 315 F. 2d 753 (C.A. 6, 1963), the petitioners rest their assertion of arbitrariness on two principal grounds: (1) Respondent failed to establish a firm opening and closing net worth, primarily because he miscalculated cash on hand at the beginning of 1956 and for each year thereafter through 1962; and (2) "Respondent failed to follow leads indicating innocence of the *174 Petitioners." To the contrary, respondent contends that his net worth statement as a whole, including the determinations of opening cash on hand for each year, is supported by the record. We realize that reasonable accuracy in the determination of opening net worth is of "vital importance" in net worth cases. Thomas v. Commissioner, 223 F. 2d 86, 89 (C.A. 6, 1955); Holland v. United States, supra; and Grubb v. Commissioner, supra. In respondent's net worth statement, opening cash on hand, as of December 31, 1955, was determined to be $5,000, and cash on hand as of December 31 of each succeeding year through 1962 was determined to be $1,000. Petitioners alleged in their petition that on January 1, 1956, they had cash accumulations of about $67,000. On brief they claim that they had the following nontaxable sources of income: 1. Given by Max Friedman
$ 42,000.00
2. Given by Samuel Kluga
27,000.00
3. Given by Mary Friedman
17,233.00
4. Cash and bonds of Mary Friedman at her death in 1964
31,288.63
Total
$117,521.63
There are two primary sources of the accumulations claimed. First, they assert that a causa mortis gift of $42,000 *175 in cash was made by Max Friedman to Joseph in 1952 and was placed in the cedar chest. The testimony of Joseph and other corroborating witnesses supports this claim. Accordingly, we have found that such gift was made. It does not follow, however, that the entire $42,000 was held by petitioners on December 31, 1955. Several factors are important in evaluating petitioners' assertion that none of the amount had been disbursed by that date. From 1946 to 1955, Joseph's practice of medicine was severely limited because of his ulcer condition, and the fees charged for the few office calls he handled were very low. Yet, as of December 31, 1955, petitioners' net worth, excluding cash on 722 hand, was $127,320.37, which included $44,514.25 in corporate securities and savings bonds and $48,249.61 in residential improvements. During 1955, Joseph deposited $33,049.61 and repaid $15,000 in advances to the construction loan account for his new house. The record does not show that he liquidated any of his assets to make such payments. Consequently, a fair inference to draw is that before January 1, 1956, all of the amount given by Max Friedman to Joseph in 1952 was used to pay for the construction *176 of his new home. Second, we accept the testimony of Joseph and Dr. Emanuel V. Shaw, his brother-in-law, that sums, totaling approximately $27,000, were periodically given to petitioners by Samuel Kluga (Henrietta Friedman's father), beginning in 1947, for the purpose of providing funds to take care of Jane Friedman. This money was kept in the cedar chest and some of it was still there on January 1, 1956. Third, we reject petitioners' contentions that they were given $17,233 by Mary Friedman and that she had accumulated cash and bonds totaling $31,288.63. These claims are not supported by the evidence. As opposed to the general and vague testimony of Joseph and his sister, Mrs. Ruth Weissberg, the evidence shows that Mary Friedman never filed any Federal income tax or gift tax returns. Her alleged source of income from rents was refuted by respondent. There is no evidence that Mary Friedman ever earned enough to accumulate any significant amount of cash in the years prior to 1956. Quite the contrary, the evidence shows that after the death of his father, Joseph contributed $60 a month for his mother's support and occasionally paid her utility and mortgage obligations. Mary Friedman *177 was obligated on a mortgage on her home which was not paid off until after Joseph was appointed as her guardian. It is incredible that she accumulated substantial funds from which she made gifts to only one of her children and to two of her many grandchildren. From the testimony that Mary Friedman always "carried money on her person," it is equally incredible to conclude that she was able to give Joseph $33,281.25 in 1956 to be deposited in savings accounts. The reasonable inference to be drawn from this record is that the $42,000 Joseph received in 1952 represented the total cash accumulations of both Max and Mary Friedman over a period of years. Accordingly, we find that during 1956 Joseph made all the deposits from petitioners' funds to the joint or trustee accounts with Mary Friedman. We are unable to agree with petitioners or respondent as to the amount of cash on hand on January 1, 1956. Like so many cases of this type, where such question can usually be resolved much more satisfactorily by agreement of the parties, we cannot, after considering conflicting evidence and testimony, accept the position urged by either party. There is, of course, support in this record for respondent's *178 contention and he has made out a rather logical case for his position. He has also fortified that position with evidence tending to show that the petitioners could not have accumulated the substantial sum of about $67,000 which they claim to have had on hand on January 1, 1956. However, we are convinced by other evidence that respondent's position is not entirely realistic or correct. We think petitioners did have more than $5,000 but certainly not such a highly inflated amount as $67,000. Therefore, we have not made either the finding requested by respondent or the finding requested by petitioners because neither would be in accord with our evaluation of the evidence and consideration of the facts. Using our best judgment, based on all the evidence, we have found that petitioners had $20,950.39 cash on hand as of January 1, 1956. See Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; Michael Potson, 22 T.C. 912 (1954), affirmed sub. nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956); and Abraham Galant, 26 T.C. 354 (1956). We note that a determination of opening *179 net worth was made exceedingly difficult by Joseph's inconsistent statements as to cash accumulations at different times during the investigation. Petitioners argue, however, that since respondent's agents did not interview Mary Friedman and Telsa Kluga, they failed to follow leads which may have established the claimed cash hoard. See Holland v. United States, supra.We find that the revenue agents made efforts to interview both women within a reasonable length of time after the facts in this case were developed through investigation. Petitioners' attorney objected to any interviews because of ill health of both women. The 723 agents interviewed Joseph's sisters and brother-in-law with regard to the same subject matter. Under the circumstances we cannot say that "the Government agents did not bother to check petitioners' story." Holland v. United States, supra at p. 135. While respondent's determination of opening cash on hand is wrong, so that the burden of proof as to the deficiencies may have shifted to respondent, [2] a substantial deficiency for each of the years 1956 through 1962 has nevertheless been established by the preponderance of the evidence *180 contained in this record. We find that respondent's determination of cash on hand at the beginning of each subsequent year from January 1, 1957, to January 1, 1962, was "substantially reliable." Phillips' Estate v. Commissioner, supra at p. 213. Approximately $20,000 of the cash on hand as of January 1, 1956, was used in making deposits to savings accounts during that year, particularly the deposits in the name of Mary Friedman. Petitioners have not attempted to establish the actual amount of receipts from Joseph's medical practice during the years in issue. Records which might have aided in such a determination were systematically destroyed by Joseph. No record at all was kept of cash payments made by patients *181 on the date of their treatment. Petitioners claim, however, that the total dollar figures appearing in Joseph's 1961 appointment book approximately equal the business receipts reported in that year. We are convinced that these dollar amounts were not entered in the appointment book on a regular basis but were posted at a later date in an attempt to substantiate the reported receipts. The fact that this record is consistent with petitioners' Federal income tax return proves only that it is consistent; it does not establish that the record accurately reflects actual receipts. Holland v. United States, supra; Davis v. Commissioner, 239 F. 2d 187 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court. In determining the increase in petitioners' net worth for each year of the net worth period, respondent included increases in savings accounts and the cost basis of additional shares of stock purchased which were owned by Joseph jointly with Jane E. Friedman, Carol M. Friedman, or Mary Friedman or were held in Joseph's name as trustee or guardian for one of these members of his family. Petitioners argue that none of these assets should be included in their *182 net worth, while, at the same time, they do not deny that substantially all deposits to each of the accounts were made by them from their own funds, that they alone held passbooks to the accounts and made withdrawals at will, that withdrawn funds and dividends from all securities were often used for their own personal purposes, and that they had complete control and custody for Carol M. Friedman after she reached her twenty-first birthday in 1961. We think petitioners' argument was long ago laid to rest by the Supreme Court in Corliss v. Bowers, 281 U.S. 376, 378 (1930): But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid. * * * The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not. * * * Joseph conducted his own affairs and those of his family so as to make it impossible to identify the individual ownership of assets. He was the only member of the immediate family to be sworn as a witness in this proceeding. In similar circumstances, *183 this Court has approved the use of the family net worth technique. See William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956). Issue 2 - Additions to Tax Under Section 6653(b) Petitioners contend that respondent has failed to prove fraud by clear and convincing evidence for any of the years 1956 through 1962 and therefore the additions to tax under section 6653(b) are inapplicable. Respondent counters with the contention that at least a part of the underpayment of tax for each of the years 1956 through 1962 was due to fraud. It is clear, and we have found on the evidence presented, that petitioners 724 understated their taxable income by approximately $150,000 over a 7-year period - an average of about $21,428 per year. During this same period Joseph Friedman reported gross receipts from his medical practice as follows: Year
Amount
1956
$21,246
1957
23,128
1958
21,462
1959
21,143
1960
22,622
1961
24,927
1962
31,851 Consistent failure to report substantial amounts of income over a number of years is, standing alone, highly persuasive evidence of fraudulent intent. Schwarzkopf v. Commissioner, 246 F. 2d 731 *184 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court; Reash v. Commissioner, 218 F. 2d 954 (C.A. 6, 1954), affirming per curiam a Memorandum Opinion of this Court, and Bollella v. Commissioner, 374 F. 2d 96 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court. But in this case there are other indicia of fraud. Joseph's records from his medical practice were admittedly inadequate, and most were not made available at trial. He admitted that all records of cash receipts were systematically destroyed and that the cash was used primarily for personal living expenses. Undeposited cash receipts were not reported in 1962 when petitioners, because Joseph's medical records had been inadvertently destroyed, reported gross receipts based upon bank deposits. Checks from patients were deposited in the various savings accounts and were used to purchase securities, cashiers checks and bonds. Joseph sometimes used the name of another family member in securing the money orders in an apparent attempt to conceal his ownership of the funds. This *185 evidence must be viewed in light of Joseph's intelligence and his experience in preparing the income tax returns for his family. It is significant, we think, that Joseph prepared no income tax returns for his mother, although he had complete custody and control of the savings accounts bearing her name. He testified that she never went to the savings institutions and that he kept the passbooks. He must have known that these accounts alone in each of the years 1958 through 1962 earned interest in excess of $1,200; yet he disavowed any responsibility for her income tax obligations. But now, when asked to account for this income, he maintains that the funds belonged to his mother and that he knew she had income from other sources. Another matter of importance is that Joseph changed his statements as to the "cash hoard" at successive meetings with respondent's agents. This figure increased from $25,000 to $40,000 and finally to the $67,000 alleged in the petition. The increased claims were made after the agents indicated that the unreported income was higher. Also significant is the fact that petitioners had personal living expenses in excess of the taxable income reported on their *186 tax returns. The following comparison between the two figures for each year is quite revealing: Year
Personal LivingExpenses
Taxable IncomeReported on Return
n
1956
$10,724.63
$10,555.00
1957
13,112.18
7,067.00
1958
15,969 .43
8,090.00
1959
18,664.59
9,708.00
1960
19,469.87
8,596.00
1961
22,859.29
9,200.91
1962
21,654.46
17,976.23
All in all, we conclude on this record that Joseph's failure to maintain accurate and complete records, his failure to report as income all receipts from his medical practice and his failure to report the income from investments over which he had unfettered command and which were converted into assets under the names of other family members were part and parcel of a conscious and deliberate attempt to evade the payment of actual tax liabilities for each of the years 1956 through 1962. Therefore, respondent has met his burden of proving fraud by clear and convincing evidence. Issue 3 - Statute of Limitations Having determined that a part of the underpayment of tax in each of the years 1956, 1957 and 1958 was due to fraud with intent to evade tax, it follows that the assessment of deficiencies for such years *187 is not barred by the statute of limitations. See section 6501(c) (1) of the Code. Issue 4 - Dividend and Interest Income for 1963 For the year 1963, respondent contends that petitioners understated their dividend 725 income by $1,219.20 and their interest income by $1,257.71. Petitioners deny the existence of any deficiency for 1963 because they contend that respondent determined their dividend and interest income for that year under the "arbitrary and capricious assumption that the income of Petitioners' children and of Petitioner husband's mother was income to Petitioners." During 1963, dividends of $593.36 were earned on shares of stock held individually or jointly by petitioners. They reported dividend income of $593.36 on their 1963 Federal income tax return. Additional dividends of $1,219.20, however, were earned on shares of stock held in one of petitioners' names as custodian for one or both of their daughters. Tax liability for the return of income on property flows, of course, from ownership rights in the property. Petitioners made all purchases and sales of the securities held in custodial form for their daughters, had custody of the stock certificates, and *188 received and deposited all dividends in their checking accounts. The dominion and control over the securities exercised by petitioners is not sufficient, standing alone, to defeat their intention to make a valid gift to their minor children. See the Ohio Gifts to Minors Act, Page's Ohio Revised Code Annot., § 1339.31. However, since the dividends on all shares so held were freely used by petitioners to satisfy personal obligations, including their obligation to support their children, we hold that they are wholly taxable to petitioners. See Rev. Rul. 56-484, 1956-2 C.B. 23. We note, in so holding, that the ownership and control of securities held in custody for Carol M. Friedman were not altered in any way after Carol became 21 years of age in 1961. Accordingly, we find that petitioners understated their dividend income by $1,219.20 in 1963. On their joint Federal income tax return for 1963 petitioners reported interest income of $3,537.94; interest of $4,795.65 was credited to all savings accounts owned solely by them, or by them jointly with or as trustee for Jane E. Friedman, Carol M. Friedman or Mary Friedman. Since petitioners retained and exercised complete *189 dominion and control over the principal and interest in all these accounts, we conclude that no valid gifts were made, Dorothy V. Crane, 49 T.C. 85 (1967), and that all interest credited to the accounts is taxable to petitioners. Accordingly, we find that petitioners failed to report in 1963 interest income of $1,257.71. To reflect the concessions made by the parties and the conclusions reached herein on the disputed issues, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
1. Held in custody for Carol M. Friedman. ↩
4. All or part of the purchase price paid by withdrawals from petitioners' bank accounts.↩
2. Held in custody for Jane E. Friedman. ↩
3. Held in custody for Carol M. Friedman and Jane E. Friedman. ↩
2. The Commissioner's determination is presumed correct, "but if error is shown, the presumption disappears and the Commissioner then has the burden of proving the correctness of his determination, or at least the correct amount actually due." Harp v. Commissioner, 263 F. 2d 139, 141 (C.A. 6, 1959); Weir v. Commissioner, 283 F. 2d 675↩ (C.A. 6, 1960). Here the respondent has presented evidence to prove the correct amount of tax due.