**Edgar L. GRUBB, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 14744.**

United States Court of Appeals
Sixth Circuit.

April 9, 1963.

Lewis B. Bolt, Jr., Knoxville, Tenn., Ben Kohler, Jr., Atlanta, Ga., on brief, for petitioner.

David I. Granger, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph M. Howard, K. William O'Connor, Attorneys, Department of Justice, Washington, D. C., on brief, for respondent.

Before CECIL, Chief Judge, McALLISTER, Senior Circuit Judge, and DARR, Senior District Judge.

McALLISTER, Senior Circuit Judge.

This is a petition for review of the decision of the Tax Court in which it found petitioner liable for income tax deficiencies in the amount of $149,635.08 for the years 1941 to 1945 inclusive, and for fraud penalties in the amount of $74,935.-22 for the same period. Petitioner admitted that the method of preparing his income tax returns showed an understate-

ment aggregating $81,812.16 for the above period of five years.

The facts, in large part, are similar to those in many cases which have come before this Court, where we have either found the taxpayer liable according to the decision of the court below, or not liable because of failure of the government's proof. Here the Tax Court found that the Commissioner was mistaken in his determination of petitioner's cash on hand for each of the five years involved, but found that the burden of proof was upon petitioner to establish what amounts of cash he had on hand during that period. Petitioner contends that since the Tax Court found the Commissioner's determination was mistaken in the above-mentioned respects, the burden of proof was not upon him to establish the correct amount of tax, his net worth, or his cash on hand during the years in question, and that the decision of the Tax Court should be reversed for this reason. Petitioner further contends that it was not shown by clear and convincing proof that he fraudulently and wilfully intended to evade his taxes.

We shall subsequently refer to the above contentions in a more detailed discussion of the case.

Petitioner was born on a small farm in Tennessee. His father was a farmer and, later, a rural mail carrier. Petitioner graduated from high school in the northern part of Knox County, and then attended the University of Tennessee at Knoxville. He graduated from the Medical College of the University of Tennessee in 1925. During the time he was going to college, he worked on the farm in the summertime. He stated that, on his request, his father let a tenant go, and permitted petitioner to take over the farm work, and that during these years, in the summer, he made $1,600 after working on the farm and selling the equipment; and that that money belonged to him. When he went to medical college, he got a job at the Memphis General Hospital in the Receiving Ward. He worked from four to eight in the late afternoon and early evening and was off

from eight to twelve. He went back to work in the hospital from midnight to seven in the morning and, after breakfast, then went to medical school. He actually had only four hours off out of the twenty-four, and slept on a stretcher cot in the hospital during the night when nothing was happening. These remarkable habits of persistence and work that would exhaust most men, as well as his application to his profession, and, in addition, engaging in other gainful pursuits, are characteristic of petitioner from the earliest glimpse of him, in the record, to his successful practice of medicine during the taxable years in question.

Upon completing his internship in 1926, petitioner owned a Ford car, the usual instruments for carrying on the general practice of medicine, a few surgical instruments, a life insurance policy, and, according to his testimony, two or three thousand dollars. He started practice in a lumber camp area at Piave, Mississippi, with another physician who had a contract practice with the lumber company and a large practice covering the countryside. Petitioner received $200 a month from the lumber company's payments, and half of the other doctor's receipts from general practice. During one month he remembered receiving, as his share of the income, $550. He lived frugally in a company-owned and furnished hotel for a dollar a day, including board and room. While he was in Piave, he and a Dr. Martin bought a drugstore, in which petitioner's share was two-thirds and Dr. Martin's share, one-third. According to his best memory, Dr. Martin paid approximately $3,600 for his one-third share. Petitioner, while in Piave, also bought a house, which was a bungalow with three bedrooms, and had a piece of rental property on it which was developed into an infirmary. Mr. W. P. Smith, of Piave, donated to him all of the operating equipment for the infirmary because of a service petitioner had performed for Mr. Smith: The son of Mr. Smith had frequent convulsions and "after we had given him more than one neurological examination and watched

him for a while, we concluded he had an intra-cranial lesion." Petitioner then communicated with Dr. Walter Daly of Baltimore, who was one of his friends, and they took the boy up for Dr. Daly to check. He agreed with petitioner as to the trouble. Petitioner testified: "We operated the young fellow and removed a cyst, an intracranial cyst, and cured his convulsions," and, in gratitude, the boy's father provided all of the operating equipment for a twelve-bed infirmary.

In 1930, after four years of practice in Mississippi, petitioner sold his real estate interest, including the infirmary, collected as many of his accounts receivable as possible, and moved to Memphis, Tennessee. From 1930 to 1932, petitioner served as a resident physician without salary in a hospital in Memphis, developing his specialty as an eye, ear, nose and throat physician and surgeon, and, during this time, his family lived with his mother-in-law in Mississippi. In the summer of 1932, upon completion of his residency, petitioner and his family came to Knoxville, Tennessee, where he has practiced medicine since. During his first two years at Knoxville, petitioner's family lived with his parents on a farm some miles from that city.

Throughout the taxable years here in question, 1941–1945 inclusive, petitioner employed a receptionist bookkeeper, and a successor bookkeeper, two assistants, at different times, to help with the patients and the office routine, a registered nurse, and afterward an accountant to prepare his income tax returns. With the exception of the accountant, petitioner's employees assisted in various ways in accepting fees. The bookkeeping work was done, however, by the bookkeeper, and her successor.

The Tax Court found that petitioner failed to keep adequate and complete books and records for his medical practice and for his other income-producing activities during the taxable years; and there is no question that such was the fact.

The net worth statement upon which the Commissioner's assessment was based, was stipulated to be correct in all but four respects—"cash on hand," "cattle," "personal living expenses," and a claimed loan of $12,500 alleged to have been made to petitioner by his father.

In this case, the only points of dispute are as to the amount in existence of cash on hand, at the beginning of the net worth period, and at the conclusion of the taxable years here involved, and— the fraudulent intention of petitioner to evade payment of his taxes. Petitioner contended that he had approximately $103,781 in cash in a safe-deposit box on December 31, 1940, the opening date of the net worth period. The Commissioner, while, in his computation of petitioner's net income by the net worth method, showed that petitioner had assets of $44,-958.42 at the opening of the net worth period, and a net worth, at that date, of $36,456.69, nevertheless, found that he had no cash on hand at that time. In the course of the hearing, petitioner testified that he had received a cash gift from his father-in-law of more than $30,000 prior to 1930. He also testified that he had received a loan, from his father, in the amount of $12,500, in August 1945. The Tax Court found that petitioner "has not established that any such gift was actually made," and "has not established that he was indebted to his father at December 31, 1945, either in the amount of $12,500 or in any other amount."

Petitioner admitted that for the five taxable years in question his net income was understated by an aggregate of $81,-812.16, but contends that he did not know this, until he had a certified public accountant examine his books in 1945 when the government commenced its investigation.

There are two issues in this case: (1) whether the Tax Court's finding that petitioner fraudulently understated his income was sustained by clear and convincing evidence; and, (2) whether the Tax Court was in error in holding that petitioner had the burden of disproving the deficiencies determined by the Commissioner according to the net worth method.

With regard to the first of the above-mentioned issues, the Tax Court found by clear and convincing evidence that petitioner had fraudulently understated his income. In answer to this finding, petitioner relied, principally, upon our decision in Wiseley v. Commissioner, 6 Cir., 185 F.2d 263, in which an overworked medical practitioner left all of his bookkeeping to inexperienced office assistants and repeatedly understated his income on his income tax returns. In that case petitioner afterward filed amended returns for three taxable years and paid an aggregate of additional income taxes in the amount of $44,000.07. The Tax Court had held that the taxpayer had been actuated by fraudulent intent to evade his taxes; but this Court determined that the finding of the Tax Court was clearly erroneous. The evidence in the Wiseley case disclosed that the physician taxpayer, because of the war emergency, worked from fourteen to sixteen hours a day, seven days a week, and took no vacations or holidays; that he saw more than eighty-five patients a day; that the assistants in his office could do no bookkeeping, and their work on the books produced complaints from patients; that his nurse was unable to keep the books and records properly and, because of overwork her health declined, she collapsed and was away from the office for several months. The taxpayer would occasionally take money from the safe, where it had been placed by the nurse, in order to buy war savings bonds and make deposits in a savings account. The Tax Court held that it did not matter that the taxpayer was busy to the point of distraction. In reversing the decision of the Tax Court, we said that this fact was vitally material to the proper determination of the question whether petitioner was guilty of fraud with intent to evade the payment of his taxes.

In the instant case, the evidence discloses that, during the taxable years, petitioner was an extremely busy and overworked physician and surgeon; that his usual office hours were from 8 A.M. to 9 P.M., or 10 P.M.—and at times even later. The registered nurse in his employ testified that she and petitioner were always at the office by 8 A.M. If there was hospital surgery, they were at the office by 7:30 A.M. She testified:

" * * * Many times it was midnight when I got home and I remember one night we didn't get there at all.

"Q. Worked all night?

"A. Yes, sir."

The number of eye, ear, nose and throat specialists in Knoxville decreased from sixteen or seventeen in the 1930's, to seven or eight in the 1940's. The Oak Ridge Development, in addition to the expansion of the Aluminum Company, had caused the influx of many thousands of employees and workers in the Knoxville area in the 1940's. The evidence shows that during the five taxable years, petitioner treated more than 70,000 patients. Petitioner's nurse stated that she rarely saw petitioner sitting down at his office. She was asked:

"Q. Did you ever see Dr. Grubb sitting down during the period, during the time he spent at his office?

"A. No, sir. Once in a while he would go back to the operating room and sit down on a small stool and drink a malted milk and then get back up and start again."

In 1944 and 1945 he was treating and operating on an average of fifty patients a day.

In addition to this tremendously large medical practice, petitioner was carrying on numerous important business enterprises. In 1945 he had six different accounts in Knoxville banks. In 1943 he had three rental properties, two of them business buildings in Knoxville, and in 1945 he had two rental properties, bringing in an aggregate of more than $43,000. In 1943 he was operating three farms. In 1944 he was operating seven farms. In 1945 he was operating five farms. On these farms there were cattle valued, during the different periods, at from $30,000 to $35,000. He had large investments in four different companies, two of which

he controlled—the Grubb-Bevins Company and the Chapman Drug Company, with total investments of more than $272,000 in those two companies in 1945. His notes receivable amounted to $13,650 in 1940, and continued in increasing amounts to $78,555 in 1945. His notes and mortgages payable, commencing in 1941 at $9,500, increased rapidly until, in 1945, they amounted to $200,759.96, and his total liabilities on December 31, 1945, amounted to $270,240.72.

It seems almost impossible that an individual with a medical practice that consumed practically all of his time, assisted by an office staff, meager under the circumstances, should have also been able to engage in such extensive business enterprises and have known what his receipts, disbursements, gross income and net income were. The government considered, however, that it had such a clear case against petitioner that it brought a criminal action against him for wilful evasion of income tax; but the jury, after fourteen days of trial, found him not guilty.

Nevertheless, there were certain definite claims made by petitioner concerning which the Tax Court found he was not telling the truth. One of these claims was that petitioner had $103,781 in cash on hand December 31, 1940, in addition to any monies that he had in bank accounts. The Commissioner found that he did not accumulate such a fund of cash between 1926 and 1941 because of several reasons, one of which was that he paid a total of only $412.59 in income tax for the total period of those years. Another reason was that he had then appeared to be living in rather straitened circumstances. Furthermore, petitioner claimed that his father-in-law made him and his wife a gift of more than $30,000 prior to 1940 and that this was part of the cash that he had on hand December 31, 1940. The Commissioner and the Tax Court did not believe that this was the truth; and there was nothing except petitioner's word to prove it. The Commissioner and the Tax Court also refused to believe that petitioner's father had subsequently made

him a cash loan of $12,500. Neither of these transactions was evidenced by any record. Further, it appeared that petitioner used a great number of undeposited and unrecorded checks, received from his patients, for a large amount of his investments. In fact, according to the net worth computations, most of petitioner's understatement of income for the five taxable years resulted from failure to report checks received by petitioner from his patients.

In its decision, the Tax Court stated:

"[We] have shown that specific items of income were omitted from petitioner's return for each of the taxable years—including not only items of professional income, but also items of farm receipts, interest, and capital gains. On his returns, he reported comparatively small amounts of income and also comparatively small amounts of tax, considering the magnitude of his operations. Both his expenditures and his increases in wealth over the years involved, are wholly inconsistent with his reported net income; and we can not believe that he honestly thought he was correctly reporting his income.

"Petitioner has sought to defend his understatements of professional income by attempting to disassociate himself from the keeping of his records (or lack thereof), from the preparation of his income tax returns, and from the handling of his office receipts. But, after seeing petitioner and those who worked for him, * * * after hearing and weighing their testimony, and after carefully considering all the facts and circumstances relevant to this point, we are satisfied that petitioner was not ignorant of what was going on. Sizable portions of the deficiencies are traceable to his failure to report as income, large amounts represented by checks which were not deposited in his professional bank account, and which were used by him for a multitude of pri-

vate uses detailed in our Findings of Fact. We do not believe petitioner's testimony in which he said that he was unaware that the amounts of these checks were not being reported in his tax returns; and that such failure to report was due solely to the ineptitude of his bookkeeper, * *."

For the five taxable years in question petitioner's income tax returns showed an aggregate income of $111,004.13. The computations of the Commissioner, by the net worth method, show an understatement of income, for these five years, of $222,881.59; and, according to the Commissioner's computations, petitioner's net worth on December 31, 1945, was $311,930.52.

▆▆ It is possible that petitioner's father-in-law made the gift in question of more than $30,000 prior to 1940; and it is possible that during the years 1926 to 1940, petitioner had accumulated an additional amount of $70,000 in cash, together with his other assets amounting to $44,958.42. It is worthy of note that we are dealing with a remarkable man, who worked his way through college and medical school, and who carried on such large and varied enterprises, while treating 70,000 patients during the taxable years 1941–1945 inclusive. Petitioner gave up the practice of medicine when he was only 54 years old. He had a heart attack and a stroke. In spite of admittedly great understatement of income on the part of petitioner, it is a case which admits of doubt. But the Tax Court, considering the repeatedly great understatements of income, the use by petitioner of checks, given by his patients, which were unrecorded on his books, the testimony which it did not believe credible, found that petitioner was guilty, by clear and convincing evidence, of the wilful filing of false returns for the taxable years; and we cannot say that the Tax Court's determination was clearly erroneous.

The second issue is with regard to the use of the net worth method. The Commissioner, in computing petitioner's deficiencies by the net worth method, found that petitioner had no cash on hand at the opening period, December 31, 1940, as above mentioned, and further that petitioner had no cash on hand at the close of the years 1941, 1942, 1943, and 1944; but the Commissioner found that petitioner had cash on hand in the amount of $14,965.75 at the close of 1945.

The Tax Court found that the Commissioner was mistaken in determining that petitioner had no cash on hand at the end of any of the years 1940 through 1944; that the record showed petitioner rarely ever deposited currency received from his patients, and also that numerous checks from patients were kept in his office for such personal uses as making investments, purchasing properties, operating his farms, and paying his personal, as well as his business, obligations; and that petitioner's office nurse and confidential secretary, on occasion, put currency into petitioner's safe-deposit box. The Tax Court stated that, in view of these facts, "petitioner has not carried his burden of proof to establish what amounts of cash he did have on hand at the end of the years 1940 through 1944; nor has he established what amount of cash in excess of the above-mentioned $14,965.75 which the Commissioner determined, he had on hand at December 31, 1945." The Tax Court went on to say that, while respondent was mistaken in his treatment of the item "cash on hand," it thought such error was harmless in the particular circumstances of the case because the Tax Court was satisfied that petitioner "did have an unestablished amount of cash on hand at December 31, 1940 (the beginning of the net worth period)," and "we likewise are satisfied for the same reasons, that he also had an unestablished amount of cash on hand at December 31 of each of the other years 1941 through 1944. We believe, in the absence of any probative evidence to the contrary, that the amount of cash on hand at each of these five dates—all representing undeposited receipts from petitioner's medical practice—was of approximately equivalent amount. Hence, even if we were able to estimate

\* \* \* the amount of cash on hand at the opening of the net worth period (which we are unable to do from the present record), we logically would be compelled to find that a comparable amount of cash was on hand in each of the succeeding year-end dates. Thus, the result would be that no change in petitioner's net income computed through use of the net worth method, would be effected; because the assets at each date would thereby be increased by a comparable amount. Also, as regards the cash on hand at December 31, 1945, the amount thereof as determined by the [Commissioner] ($14,965.75) would similarly have to be increased; and again no change would be reflected in the net income determined through the use of the net worth method."

■■ When the Commissioner's determination is wrong, no presumption of a correctness attaches to it, and there is no burden upon the taxpayer to show what is the correct determination. The Tax Court found that the Commissioner's computation of cash on hand was incorrect. There is no evidence that petitioner had cash on hand (as the Tax Court found) in the amount of $14,965.75 on December 31, 1940, and the same amount of cash on hand at the close of 1941, 1942, 1943 and 1944; and that the amount of cash on hand at the close of 1945 was double the amount of any of the other years. The computations of cash on hand found by the Tax Court are arbitrary and, as far as can be ascertained, based on a guess. Accuracy in the determination of opening net worth is necessary in net worth cases, and accuracy in the determination of cash on hand at the opening of the net worth period is necessary to establish the opening net worth. Thomas v. Commissioner, 232 F.2d 520, 526 (C.A. 1); Holland v. United States, 348 U.S. 121, 132, 75 S.Ct. 127, 99 L.Ed. 150.

Once the determination of the Commissioner is found to be wrong, it is not incumbent on the taxpayer to prove that he owes no tax, or what tax he did owe.

After finding that the Commissioner was mistaken in his computations of petitioner's cash on hand, the Tax Court erred in holding that the burden was upon the taxpayer to establish what amounts of cash he had on hand at the end of any of the years 1940–1945.

In accordance with the foregoing, the decision of the Tax Court is reversed and remanded for further proceedings.