WILLIAM J. JACOBS, JR., and JENNIE JACOBS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobs v. Commissioner
Docket No. 6880-70.
United States Tax Court
T.C. Memo 1974-73; 1974 Tax Ct. Memo LEXIS 244; 33 T.C.M. (CCH) 379; T.C.M. (RIA) 74073; March 27, 1974, Filed. *244 William J. Jacobs, Jr., pro se. Larry L. Nameroff, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: [1] Respondent determined the following deficiencies in, and additions to, the Federal income taxes of petitioners William J. Jacobs, Jr., and Jennie Jacobs: Additions to Tax
Taxable Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
(I.R.C. 1954)
(I.R.C. 1954) 1959
$ 8,709.80
--
$ 435.49
1960
44,643.93
$2,205.24
2,255.24
1961
13,812.09
678.06
716.54
1962
28,524.98
1,426.24
1,460.35
1963
15,874.78
2,792.57
930.86
Total
$111,565.58
$7,102.11
$5,798.48 The issues presented for decision are listed below. Unless otherwise noted, each issue is raised in all taxable years (1959 through 1963) before the Court. 1. Whether respondent correctly determined an understatement of petitioners' taxable income using the personal expenditures method of income reconstruction; 2. Whether petitioners are entitled to depreciation deductions greater than the amounts allowed *245 by respondent on certain rental real estate; 3. Whether petitioners have substantiated itemized deductions greater than the itemized deductions or standard deductions allowed by respondent; 4. Whether petitioners have established that they sustained a $3,000 capital loss in 1962; 5. Whether petitioners are liable for additions to tax under section 6651(a)[2] for failure to file timely income tax returns for years 1960 through 1963; 6. Whether petitioners are liable for additions to tax under section 6653(a) for negligence with respect to any underpayment of their income taxes; and 7. Whether petitioner Jennie Jacobs is relieved of any tax liability under the "innocent spouse" provisions of section 6013(e). FINDINGS OF FACT Petitioners are husband and wife, and they resided in Toledo, Ohio, at the time they filed their petition in this proceeding. They filed joint Federal income tax returns for 1959 through 1963 with the district director of internal revenue in Cleveland, Ohio. The dates on which petitioners' returns for 1960 through 1963 were *246 filed are as follows: Taxable Year
Date Filed 1960
April 25, 1961
1961
May 11, 1962
1962
May 7, 1963
1963
July 2, 1964
An accountant prepared petitioners' returns for each of these years. 1. Reconstruction of Income During 1959 through 1963, William J. Jacobs, Jr., hereinafter referred to as petitioner, was engaged in the practice of law in Toledo, Ohio. Until late 1961, petitioner practiced law with a partner, Robert Devine, in a firm known as Jacobs & Devine. From 1959 through November 1961, petitioner and Devine kept most of their clients' escrow funds in a single checking account, hereinafter referred to as the escrow account. After November 1961, petitioner and Devine ceased practicing law together, and the escrow account was closed out. Thereafter, during 1962 and 1963, clients' funds deposited with petitioner were either segregated into individual trust checking and savings accounts or commingled in petitioner's personal checking account. While he was practicing law, petitioner frequently used clients' escrow funds for unauthorized personal purposes. Some of these purposes are described below. A substantial amount of the escrow funds was spent in acquiring and refurbishing *247 the premises of the Patio Lounge, Inc., hereinafter sometimes referred to as the lounge, which apparently was a tavern in which petitioner acquired a one-third shareholder's interest. Starting in December 1959, petitioner kept a partial record of the checks he drafted on the escrow account for the benefit of the lounge. Petitioner's records show that by August 1961, the lounge owed the escrow account $16,781.66. Petitioner gambled frequently throughout the years in issue. In order to finance his gambling, petitioner regularly drafted checks on the escrow account payable to himself or cash, used the cash in gambling, and, after gambling, redeposited whatever cash remained. During the time that Jacobs & Devine maintained the escrow account, petitioner limited his unauthorized borrowing and redepositing mainly to the escrow account. After terminating the escrow account in late 1961, petitioner continued the redepositing procedure using his personal account. Consequently, a substantial portion of the total amount of checks payable to petitioner or cash out of petitioner's personal account from December 1961 through 1963 was not actually expended by petitioner. In addition to the unauthorized *248 uses described above, petitioner would sometimes write checks on a personal account with insufficient funds and then cover such checks by transferring cash out of the escrow or clients' trust account into his personal account. This transferral of clients' fund into petitioner's personal account occurred throughout the years in issue. Although the precise amount of cash sums drawn and redeposited or transferred is not ascertainable from the record, the following table shows a comparison of the approximate total checks payable to cash or to petitioner drawn on petitioner's personal account with the total cash deposits in such account during 1962 and 1963: 1962
1963 Total checks payable to cash or to
$43,398.99
$32,627.52
petitioner
Total cash deposits
$39,627.52
$32,076.36 Sometime prior to 1961, petitioner was contacted by an internal revenue agent, hereinafter referred to as the agent, who sought information about one of petitioner's clients. In the course of a conversation during which petitioner refused to provide the agent with the information he desired, petitioner and the agent became quite angry with each other. In 1961, petitioner's 1959 and 1960 income tax returns were audited *249 by the same agent. Petitioner cooperated fully with the agent during this initial investigation and provided a lead which prompted the agent to audit petitioner's return for 1961. Because petitioner's deposit slips, checks, and check stubs failed to reconcile with the receipts and disbursements recorded in a receipt book and certain clients' ledger accounts maintained by petitioner, the agent recomputed petitioner's taxable income by the bank deposits method. Suspecting that the unauthorized use of clients' funds by petitioner constituted embezzlement, sometime in 1962 the agent recommended to the Intelligence Division of the Internal Revenue Service that petitioner be prosecuted for fraud. However, such prosecution was not pursued. Meanwhile, the agent proceeded to audit petitioner's income tax returns for 1962 and 1963. During this latter audit petitioner did not cooperate with the agent. Because petitioner's records of receipts and disbursements for 1962 and 1963 were inadequate to recompute petitioner's income under the bank deposits method, the agent instead used the personal expenditures method. The agent also recommended that the Intelligence Division prosecute petitioner *250 for fraud as to years 1962 and 1963, but the prosecution was not pursued. In a notice of deficiency dated August 13, 1970, respondent determined, along with other adjustments to be discussed separately, infra, that: In the absence of adequate records, your taxable income for the taxable [years] * * * [1959 through 1963] has been computed by reference to bank deposits and cash payments, plus personal and other nondeductible expenditures. Thus, your reported taxable income has been increased * * * as shown in Exhibit A. Exhibit A, set forth below, was attached to the notice of deficiency along with related Exhibits B-1 through B-5 entitled "Bank Account Analysis" for the taxable years 1959 through 1963, and Exhibit B-6 entitled "Deposits From Escrow Account on a Reconstructed Basis." [3] Most of the figures shown in Exhibit A are transcribed from Exhibits B-1 through 6 which reflect in greater detail the method used in reconstructing petitioner's income. The figures contained in Exhibits B-1 through 6 are derived from the computation of the agent who audited petitioner. Exhibit A is set out below: William J.
Exhibit A Determination of
Jacobs, Jr. and
Understatement of Income
Jennie Jacobs
1959
1960
1961
1962
1963 (1) Pers.
$46,504.50
$126,698.25
$238,006.83
$122,000.37
$115,253.21
expend. (Exh. B)
(2) Adjustments
3,989.33
(4,927.18)
3,330.69
15,313.42
(5,045.28)
for: (a) Incr.
or (Decr.) in
bank bal.
(b) Transfers
(8,811.64)
(11,296.34)
(43,635.00)
---
---
incl. in line 1
(c) (Incr.) or
---
(15,379.69)
(126,536.59)
10,628.53
(58,681.87)
Decr. in escrow
(d) Loan
(4,050.00)
(1,000.00)
(25,262.45)
(79,089.69)
--
proceeds
(e) Net
(8,872.31)
(32,603.21)
(192,103.35)
(53,147.74)
(63,727.15)
adjustment
(3) Personal
37,632.19
94,095.04
45,903.48
68,852.63
51,526.06
expenditures
from current
income
(4) Cash
10,230.18
7,102.04
8,976.14
9,269.42
18,605.97
available from
reported income
(5)
$27,402.01
$ 86,993.00
$ 36,927.34
$ 59,583.21
$32,920.09
Understatement
Cash available
from reported
income:
Schedule C
$ 6,233.23
$ 5,910.29
$ 7,685.45
$ 7,972.23
$ 17,248.78
Depreciation
354.95
471.75
510.69
517.19
517.19
Schedule D
2,862.00
---
---
---
---
Gross rents
780.00
720.00
780.00
780.00
840.00
Total
$10,230.18
$ 7,102.04
$ 8,976.14
$ 9,269.42
$ 18,605.97
*251 Line (1) in this table, entitled "Pers. expend.," includes three items: (a) all personal checks written by petitioner on the escrow account; (b) all withdrawals from savings accounts in which clients' funds were deposited; and (c) all checks drawn on petitioner's personal account payable to him or to cash. The net amounts of lines (2) (a) through (2) (e) were subtracted from the figures in line (1). Line (2) (a) reflects the net increase or decrease in the cash balances in both client and personal accounts at the end of each year over the balances at the end of the preceding year. Line (2) (b) represents the amounts transferred between client and personal accounts which were initially included in line (1). There is no line (2) (b) adjustment for 1962 and 1963 because interaccount transfers were not included in the line (1) total for those years.
The figures in line (2) (c) are the amounts by which the escrow balances as reconstructed increased or decreased in relation to the preceding year's *252 escrow balances as reconstructed. [4] In reconstructing the amounts deposited in the escrow accounts, the agent apparently worked backwards, beginning with the payments out of the escrow account, a known figure, and the yearend figure, the source of which is not shown. The yearend escrow balance, reconstructed in this manner, bears no relationship to the actual cash balance in the clients' accounts. Line (2) (d) of Exhibit A reflects the amounts of borrowed funds, identified by the agent, included in the bank *253 deposits each year. Line (2) (e), entitled "Net adjustment," is the sum of lines (2) (a) through (2) (d). For each year, line (2) (e) was subtracted from line (1) in arriving at the figures in line (3), entitled "Personal expenditures from current income." Line (4) reflects the amount of cash which petitioner had available from reported income, and line (5), entitled "Understatement," is the remainder after subtracting line (4) from line (3). In his computations of the understatement (line (5)), respondent makes no adjustments for cash sums withdrawn by petitioner and redeposited. 2. Depreciation on Duplex In 1954, petitioner purchased a two-story, four-bedroom house and lot for $20,500. After improvements were made, the building was converted to a duplex with petitioner and his family living on the ground floor and renting the upper floor. In 1958 and 1959, petitioner added a bedroom and made further improvements to the holding costing approximately $4,900. Petitioner borrowed the money to pay for these improvements. On their returns for the years 1959 through 1963, petitioners claimed depreciation deductions on the rental portion of the duplex in the amount of $513.04 in *254 each year. The $513.04 figure was computed by multiplying 4 percent, the straight line depreciation rate, times $25,652.15, the claimed depreciable basis, and allocating half the total to the depreciation on the rental portion. In the notice of deficiency and Exhibit C attached thereto, respondent allocated a $3,000 basis to the land and a $14,344 basis to the building, and allowed depreciation computed on a 4-percent straight line rate on half of the basis of the building, $7,167. Respondent also allowed depreciation on one-half of the bases of the improvements, determined to be $669.67. The depreciation deduction allowed by respondent in each year totaled $304.19. Except as they may be contained in the above Findings, Findings of Fact pertaining to issues 3 through 7 are not separately stated. OPINION 1. Alleged Understatement of Taxable Income Except for some ledger accounts that for the most part do not corroborate petitioner's testimony pertaining to purported escrow payments made on his clients' behalf, petitioner has offered no books or records showing that his taxable income was correctly reported on his returns for 1959 through 1963. A receipt book for the escrow *255 account which might have shed some light on the unidentified cash and check deposits was mentioned but not produced by petitioner. Even one of petitioner's own witnesses, an accountant and former internal revenue agent, indicated he could not reconcile petitioner's unreported income with petitioner's records. Under these circumstances, we think respondent was justified in recomputing petitioner's liability under any reasonable method which would clearly reflect his income. See section 446(b); Harp v. Commissioner, 263 F.2d 139, 141 (C.A. 6, 1959); Lusk v. Commissioner, 250 F.2d 591, 594 (C.A. 7, 1957); and Thomas v. Commissioner, 223 F.2d 83, 85 (C.A. 6, 1955). The evidence shows that the revenue agent first began a reconstruction of petitioner's income by use of the bank deposits method. That method treats amounts deposited as income where (1) the taxpayer was engaged in an income-producing business; (2) he made periodic deposits into bank accounts; and (3) an adequate investigation was made to negative the likelihood that the bank deposits arose from nontaxable sources. In the course of the investigation, the agent switched to the personal expenditures method of income reconstruction *256 which respondent describes in his reply brief as follows: A personal expenditures method is based on the theory that an individual spends a certain amount of money which must have come from some source. Given the fact that the amount of expenditures can be determined and that a source for the income is available, it then is incumbent upon the petitioner to prove that the expenditures were made from sources other than income. In making this change from the bank deposits method, which emphasizes the source of funds, to the personal expenditures method, which emphasizes the use or disposition of funds, we think respondent committed errors in both the theory and application of the personal expenditures method of income reconstruction. We think respondent's foregoing definition of the personal expenditures method of income reconstruction overlooks safeguards necessary to a reasonable and realistic estimate of a taxpayer's income. [5] *258 In the light of the testimony and other evidence of record, and after a careful analysis of the computations attached to the notice of deficiency, we hold that respondent's determinations cannot be sustained because of errors which manifest a "strong underlying *257 element of guesswork." Polizzi v. Commissioner, 265 F.2d 498, 502 (C.A. 6, 1959). First, we are not satisfied that the agent made any real investigation to ascertain that the amounts treated as personal expenditures were actually or finally expended by petitioner. The agent made long lists of the checks written by petitioner. An extremely high percentage of the checks were made payable to cash or petitioner, but only a very limited number of them have second endorsements indicating that they were negotiated to third parties. No adequate measures *259 were shown to have been taken to see that the proceeds of those checks without second endorsements were not eventually redeposited. Petitioner gave uncontradicted testimony that he frequently withdrew funds, used what he needed for gambling or other purposes, and then redeposited the leftover cash. In light of the large amounts of unidentified deposits shown in each taxable year by Exhibits B-1 through B-5, [6] *260 it is entirely credible that very substantial amounts of the unidentified check and cash deposits are redeposits. Accordingly, we think treating the repeated withdrawal and redeposit of the same money as taxable personal expenditures, as respondent has done, unrealistically increases petitioner's taxable income. Respondent's own analysis shows deposits (in excess of $200) of unidentified cash made by petitioner within three days of checks issued to himself or "cash" in total amounts of $1,527.12 in 1959, $6,049.50 in 1960, $21,622.50 in 1961, $13,086.06 in 1962, and $17,178.95 in 1963. While there is no reason to limit the adjustment for redeposits to those made within three days, we find no credit given even for these amounts. In essence, the agent proceeded on the assumption that if petitioner withdrew funds, he always expended the full amounts withdrawn and never deposited any amounts remaining from his withdrawals. Indeed, the agent admitted that, although he found checks that could have been cash redeposits, he still listed them as unidentified cash. [7] *261 In addition, no adjustment was made for loans made and repaid during 1962 and 1963. In conducting the audit, the agent asked petitioner the purpose of numerous checks petitioner had written, and petitioner stated that a substantial number of them were used to make loans to clients. Respondent treated those checks as personal expenditures. While the agent gave petitioner some credit for deposits of "note receivable payments" claimed for 1959, 1960, and 1961, in amounts stated below, [8] no such credits were allowed for other years. To the extent petitioner is not credited for withdrawals of the bank deposits derived from the collection of loans made during the tax years, he is being taxed at least twice on the same amounts. We have no evidence indicating the agent eliminated, or even made any effort to adjust for, loan collections in 1962 and 1963. Second, respondent's *262 explanation of his treatment of escrow funds is baffling. [9] *263 In his opening statement, respondent's counsel stated: I want to make it clear to the Court that the Respondent is not taking the position that the Petitioner's use of his client's funds for this purpose constituted personal expenditures and chargeable to him as income. In the statutory notice, we have made an adjustment for changes in his escrow account balance. We were able to determine from his records, to eliminate from the computation any possibility that we would be charging misappropriation, embezzlement, or something of that nature. That computation, Your Honor, does appear in the statutory notice as Exhibit B(6). Further, on brief respondent declares that "petitioners were given the benefit of all doubt in the treatment of escrow funds, as the computation reflects adjustment to income source as the ending balances of the escrow accounts fluctuate." Taken at face value, these statements appear to reflect a concession that, under the method of income reconstruction used by respondent, petitioner's withdrawals of escrow funds were not misappropriations, embezzlements, conversions, or any other form of taxable income, but were borrowed funds. Yet line (1) of Exhibit A, entitled "Pers. expend.," as stated in our Findings, includes all withdrawals from the escrow checking accounts not identified as disbursements for business purposes or interaccount *264 transfers plus all withdrawals from trust savings accounts in which clients' funds were deposited. If respondent's explanatory statements accurately reflect his position, the simplest way to have given effect to that position would have been to eliminate completely the withdrawals of clients' funds in making the computations of the amounts shown on line (1) of Exhibit A. Instead, Exhibit B-6, carried over to Exhibit A as line (2) (c), adjusts personal expenditures only by the increase or decrease in the yearend balance in the "reconstructed" escrow account. The effect, notwithstanding the foregoing statements by respondent's counsel, is to include in personal expenditures all withdrawals from the escrow accounts, not identified as business withdrawals or transfers, adjusted only by a smaller figure representing the increases or decreases in the reconstructed escrow account balance. The result is to include in the reconstructed taxable income a very substantial part of the withdrawals from the escrow and savings accounts. Respondent's meager explanations of the computations in Exhibit B-6, carried over to line (2) (c) of Exhibit A, are incomprehensible from the record. As we understand *265 the sketchy testimony, the escrow account balance adjustment purportedly represents the yearend increase or decrease of the current year's escrow balance as reconstructed over the preceding year's reconstructed balance. In reconstructing the hypothetical deposits in the escrow accounts, the agent apparently has worked backwards on the basis of payments out of the escrow accounts, which is a known figure, and the yearend balance, the source of which figure is not shown. However, it is clear that the reconstructed yearend escrow balance bears no relationship to the actual cash balance in the client account(s). Further, most of the deposits in the escrow or trust accounts maintained during 1959, 1960, and 1961 were unidentified as to source. The identified escrow payments in those years far exceeded the identified escrow deposits, but were substantially less than the total deposits to those accounts. [10] *267 As we understand respondent's method of income reconstruction, the excess of escrow or trust deposits over identified escrow payments was generally treated as funds available for taxable personal expenditures. We think it highly unlikely that petitioner would have deposited large quantities *266 of his personal funds in these accounts (even assuming he had personal funds in such quantities) except to redeposit moneys withdrawn for personal use. The same principle evidently applies as to 1962 and 1963, when the escrow funds were kept mainly in savings and personal accounts. Yet the sole adjustment to take account of the unidentified nontaxable funds in the escrow accounts, reflected in Exhibit B-6, compensates only for identified variations in yearend balances of the so-called reconstructed escrow account. As stated above, the logic of this adjustment escapes us. While petitioner apparently commingled some of the funds he held in escrow for his clients with his own money, there is no suggestion that he actually embezzled funds or ever failed to produce the funds needed to meet his commitments to his clients. Nonetheless, respondent had treated the escrow funds maintained during 1959, 1960, and 1961 as a primary source of taxable expenditures. Third, despite the burden of proof resting on a petitioner in routine deficiency cases, the Court of Appeals for the Sixth Circuit has repeatedly held that a determination of opening net worth (or other evidence that the ostensible income was not derived from pretax-year accumulations) is vital to the validity of the method of income reconstruction here adopted by respondent. Thomas v. Commissioner, 223 F.2d at 89; see also Grubb v. Commissioner, 315 F.2d 753, 758-759 (C.A. 6, 1963); and Harp v. Commissioner, 263 F.2d at 142. The personal expenditures method of income reconstruction, as explained in the quotation in footnote 5 from Taglianetti v. United States, 398 F.2d 558, 562-563 (C.A. 1, 1968), affirmed per curiam on *268 another issue, 394 U.S. 316 (1969), is a variant of the net worth method. One essential requirement for the use of that method is a comparison of the taxpayer's opening net worth with his closing net worth or some other comparable safeguard. Fuller v. Commissioner, 313 F.2d 73, 77 (C.A. 6, 1963). The reason for this requirement is to assure "to a reasonable certainty that the income expended did not spring from prior accumulations or earnings for which the * * * [taxpayer] would not be liable in taxes." United States v. Penosi, 452 F.2d 217, 219 (C.A. 5, 1971), certiorari denied 405 U.S. 1065 (1972). Respondent's determination does not purport to include either an opening or closing net worth. The agent evidently attempted to cure this defect by demonstrating that there were sufficent deposits during each of the tax years (1959 through 1963) to provide a source for the personal expenditures treated as taxable income. The agent also gave petitioner credit for "note receivable payments" during 1959, 1960, and 1961 in amounts set forth in footnote 8, supra. But there is no showing that an adequate investigation was made to ascertain whether the huge amounts of unidentified cash and *269 check deposits for each of the years in controversy were derived from assets available prior to 1959. Finally, courts, and especially the Court of Appeals for the Sixth Circuit, have long been attuned to the dangers inherent in indirect methods of proof. In Polizzi v. Commissioner, 265 F.2d at 502, a net worth case involving a civil tax deficiency, the Court of Appeals said: In Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, the Supreme Court said that the use of the net worth method is fraught with danger for the innocent and that the courts must closely scrutinize its use. It pointed out that although it may sound fair to say that the taxpayer can explain the "bulge" in his net worth, he may be entirely honest and yet unable to recount his financial history. In electing to use the net worth method the Government assumes certain obligations which must be complied with in order to make such procedure a fair one for the taxpayer. What we really have here is * * * the question of determining whether under the particular circumstances of this case the evidence, or the lack of evidence, considered as a whole in the light of the warnings given to us in Holland v. United States, supra, *270 was of such a character as to rebut the presumption that the Commissioner's deficiency determination was correct. Andrews v. Commissioner, 2 Cir., 135 F.2d 314, 318-319, certiorari denied 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444. Inasmuch as the expenditures method is a variant of the net worth method, we think the same cautious approach should apply here. When used accurately, the personal expenditures method of income reconstruction produces at best only an approximation of the taxpayer's taxable income. While a taxpayer is not permitted "to rely upon his ability to conceal the detailed facts of his income * * * to avoid the imposition of taxes which the collecting authorities may show to be lawfully due," Bryan v. Commissioner, 209 F.2d 822, 827 (C.A. 5, 1954), neither is respondent permitted to base his determination on a "strong underlying element of guess work." Polizzi v. Commissioner, supra.
Decision in this case requires a balancing of these two considerations. Under the decisions of the Court of Appeals for the Sixth Circuit, to which an appeal would be taken in this case, we think on these facts respondent's determination has lost its prima facie correctness and, therefore, *271 the burden of showing the correct amount of taxable income shifts to respondent. Durkee v. Commissioner, 162 F.2d 184, 187 (C.A. 6, 1947); Thomas v. Commissioner, 223 F.2d at 89; see also Grubb v. Commissioner, 315 F.2d at 759; and Harp v. Commissioner, 263 F.2d at 141-142. The evidence presented by respondent does not show the correct amount of petitioner's reconstructed taxable income or provide any basis for estimating it. Thus, this issue is decided for petitioner. 2. Depreciation on Duplex The only issue pertaining to petitioner's depreciation expense deduction is the proper basis to be allocated to the rental portion of the duplex property. Section 167(g) generally provides, when read in conjunction with sections 1011(a), 1012, and 1016(a) (2), that the depreciable basis of property shall be the adjusted cost basis of the property for purposes of determining gain on the sale or other disposition of such property. As reflected in our Findings, the original cost basis of petitioner's duplex and lot was $20,500, and capital improvements of $4,900 were made in 1958 and 1959. Clearly, the lot on which the duplex is situated and the portion of the duplex in which petitioner *272 and his family live are not depreciable property, but the portion of the duplex held for rental purposes is. The parties apparently agree that one-half of the duplex is used for rental purposes.
In cases where a combination of depreciable and non-depreciable property is acquired for a lump sum, "the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time." Sec. 1.167(a)-5), Income Tax Regs. In the present case, respondent has determined that the cost basis for the land is $3,000, and petitioner has failed to introduce any evidence other than his own testimony showing otherwise. Accordingly, of the $20,500 lump sum paid for the duplex property, $17,500 is allocated to the house, and of that figure, $8,750 is allocated to the portion of the building used for rental purposes. With respect to the capital improvements of $4,900, the record does not show clearly whether the improvements benefited the personal or rental portion of the building, or both. Under the principle of Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930), *273 we think a fair approximation would be to allocate one-half, or $2,450, to the adjusted basis for depreciation purposes. Accordingly, petitioner's total basis for depreciation purposes is $11,200, and the annual depreciation expense deduction figuring a 25-year useful life for the building is $448. 3. Substantiation of Itemized Deductions Petitioner claimed itemized deductions during the listed taxable years as follows: Taxable Year
Total Itemized Deductions 1959
$1,471.95
1961
1,270.76
1962
1,744.01
1963
2,490.29
Respondent determined that petitioner is entitled to itemized deductions totaling $1,190.05 in taxable year 1959, and the maximum allowable standard deduction of $1,000 in each of the taxable years 1960 through 1963.
Respondent disallowed petitioner's itemized deductions because of lack of substantiation. By his own testimony corroborating checks paid for certain charitable contributions, local taxes, and legal expenses, petitioner substantiated itemized deductions in taxable year 1963 totaling only $816.75. Accordingly, respondent's determination as to all taxable years is sustained. 4. Substantiation of Capital Loss On Schedule D attached to their 1962 income tax return, *274 petitioners reported a $3,000 long-term capital loss from the sale of three shares of Patio Lounge, Inc., stock. Schedule D shows that the stock was acquired in September 1961, and sold on November 12, 1962; however, the sales price and basis of the stock are not shown. As a result of the $3,000 long-term capital loss reported, petitioner took $1,000 deductions in each of the years 1962 and 1963. Respondent disallowed such deductions for lack of substantiation. Unfortunately, the record is devoid of information pertaining to the sale or other disposition of this Patio Lounge, Inc., stock. We do know that petitioner acquired a one-third interest in the lounge, incorporated the business, and made payments totaling at least $16,781.66 out of the escrow account on behalf of the lounge. A liquor permit application for the lounge, dated September 18, 1961, states that each of the three shareholders paid $3,000 out of their personal savings to acquire their stock. On the basis of this evidence, we think petitioner substantiated his adjusted basis in the stock.
However, without some proof of the manner of the stock's disposition, and the consideration, if any, received on the disposition, *275 we are unable to determine that petitioner actually sustained a $3,000 loss in 1962 for which he was not compensated. See section 165(a). The burden of proving that such loss occurred is on petitioner, and he has not met his burden. Respondent's determination in this issue is sustained. 5. Failure to Timely File Income Tax Returns Petitioners failed to file their income tax returns on time for taxable years 1960 through 1963. The taxable years and the dates the corresponding returns were filed are as follows: Taxable Year
Date Filed 1960
April 25, 1961
1961
May 11, 1962
1962
May 7, 1963
1963
July 2, 1964
For each of these taxable years, respondent has asserted a delinquency penalty under section 6651(a), which adds to petitioners' tax liability 5 percent of such tax for each month or fraction thereof that the return is late, not to exceed 25 percent in the aggregate, unless petitioners can show that the delinquency was due to reasonable cause and not due to willful neglect. In deciding whether the failure to file a timely return was "due to reasonable cause," the test to be applied is that of "ordinary business care and prudence." Sec. 301.6651-1(c) (1), Procedure and Administration *276 Regs. This issue is purely factual and it is incumbent upon petitioner to prove that the penalty should not be applied in this case. Petitioner, an attorney, had an accountant prepare his tax returns for each of the taxable years in which the penalty is asserted. Petitioner testified that he gave the accountant the necessary information and signed apparently a blank return before each of the April 15 filing dates, but that the accountant did not mail the returns until after the due dates had passed. Petitioner relies solely on his own testimony to substantiate the reasonable cause of his late filing. We are compelled to hold for respondent on this issue. Without the testimony of the accountant who prepared the returns or other evidence which might further illuminate the circumstances of the returns being filed late for four consecutive years, we are unable to determine the reasonableness of the cause of the late filing. The responsibility for filing a return on time is placed squarely on each and every taxpayer, Charles C. Rice, 14 T.C. 503, 509 (1950), and petitioner cannot escape that responsibility merely by hiring an accountant to prepare and file his returns. Estate of Frank Duttenhofer, 49 T.C. 200, 205-206 (1967), *277 affirmed per curiam 410 F.2d 302 (C.A. 6, 1969); Logan Lumber Co. v. Commissioner, 365 F.2d 846, 853-854 (C.A. 5, 1966). 6. Negligence Penalty Respondent determined that part of the underpayment of petitioners' tax for the taxable years 1959 through 1963 is due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Consequently, respondent added to petitioners' tax an amount equal to 5 percent of the determined underpayment in those years.
Unlike the case involving the fraud penalty provided in section 6653(b), the burden of proving that the imposition of the negligence penalty is erroneous rests upon the taxpayer. David Courtney, 28 T.C. 658, 669 (1957); Gibbs & Hudson, Inc., 35 B.T.A. 205, 211 (1936). Petitioner has addressed no evidence to show that the penalty is unjustified. Accordingly, the 5-percent penalty is sustained in each year, to be recomputed to take account of our holdings on the other issues in this case. 7. Innocent Spouse Provision Petitioners William J. Jacobs, Jr., and Jennie Jacobs filed a joint Federal income tax return for each of the years 1959 through 1963. Acting as counsel on behalf of his spouse, *278 petitioner argues that his wife received "no benefit and should be released from any of the assessment Respondent is requesting." We assume petitioner is referring to section 6013(e), which generally provides that when three conditions are met, the "innocent spouse" is to be relieved of tax liability to the extent that such liability is attributable to an omission from gross income. The first requirement, contained in section 6013(e) (1) (A), is that the amount omitted from gross income must equal more than 25 percent of the gross income shown on the return. This provision was intended to limit the relief provided in the statute to those cases where the income omitted represents a significant amount relative to the reported income. S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), 1971-1 C.B. 606, 607. In section 1 of this opinion, we have held that petitioner is not liable for any additional taxes due to respondent's defective computations under the personal expendtures method of income reconstruction. The remaining issues decided pertain only to deductions or additions to tax. Accordingly, it is readily apparent that there is no longer an "omission" from petitioners' gross income *279 that would render section 6013(e) applicable. Both petitioners in this proceeding are jointly and severally liable for any deficiency determined in the Rule 155 computation. See section 6013(d) (3). On brief petitioner for the first time makes the contention that assessment and collection of any deficiencies for the years in question are barred by the statute of limitation. The notice of deficiency pertaining to taxable years 1959 through 1963 was mailed on or about August 13, 1970. In the petition, however, there was no allegation or statement of fact with respect to the question of the statute of limitation, and at the trial no mention was made thereof. Ordinarily, when the issue of statute of limitation is raised, the burden is placed upon respondent to show any extension of the statutory period. However, there is no such burden when the issue is not raised in the pleadings. Orderly procedure requires that the issues be clearly framed in the pleadings that both parties may have notice and an opportunity to produce their evidence. An orderly procedure is necessary if the * * * [Court] is to handle the large number of cases filed with it and if proper records are to be made *280 for review in the courts. To attempt to decide any issue with respect to the statute of limitations upon the basis of an ex parte statement in the brief * * * would be to deny the respondent a hearing upon this issue and an opportunity to produce his evidence. United Business Corporation of America, 19 B.T.A. 809, 831 (1930), affd. 62 F.2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635 (1933). See also R. G. Robinson, 12 T.C. 246, 248 (1949), affd. 181 F.2d 17 (C.A. 5, 1950). Accordingly, since petitioners failed to plead the statute of limitation, we must regard the question as having been waived, and we shall not consider it. Given v. Commissioner, 238 F.2d 579, 583 (C.A. 8, 1956). Decision will be entered under Rule 155. Footnotes
1. Pursuant to a notice of reassignment sent to petitioners and respondent, and to which no objections were filed, this case was reassigned by the Chief Judge from Judge Austin Hoyt to Judge C. Moxley Featherston↩ for disposition. 2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
3. Another exhibit attached, Exhibit C entitled "Computation of Allowable Depreciation Expense on Items Changed," will be discussed separately in the second part of our Findings of Fact, infra. ↩
4. Exhibit B-6, set forth below, reflects respondent's computation of the escrow account balance differences as reconstructed by the examining revenue agent and carried forward to line (2) (c) of Exhibit A. ↩
William J.
Exhibit B-6 Deposits
Jacobs, Jr.
From Escrow Accounts on
and Jennie
a Reconstructed Basis
Jacobs
Year
Escrow and
Deposits
Payments
Balance
Bank
Fiduciary
(Reconstructed)
12/31
Balance
Fund Balance
12/31
1/1
1959
Unknown
Unknown
$126,120.86
$ 53,263.29
$ 3,989.33
1960
$ 53,263.29
$192,776.12
177,396.43
$ 68,642.98
$ (937.85)
1961
$ 68,642.98
$259,227.21
$132,690.62
$195,179.57
$ 2,475.02
1962
$195,179.57
$ 87,676.91
$ 98,305.44
$184,551.04
$17,788.44
1963
$184,551.04
$165,047.90
$106,366.06
243,232.88
$12,743.16
5. The cash or personal expenditures method of income reconstruction was explained as follows in Taglianetti v. United States, 398 F.2d 558, 562-563 (C.A. 1, 1968), affirmed per curiam on another issue 394 U.S. 316 (1969): * * * [The cash expenditure theory] is a variant of the net worth method of establishing unreported taxable income. Both proceed by indirection to overcome the absence of direct proof. The net worth method involves the ascertaining of a taxpayer's net worth positions at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income. This method, while effective against taxpayers who channel their income into investment or durable property, is unavailing against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before. The cash expenditure method is devised to reach such a taxpayer by establishing the amount of his purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year. The beginning and ending net worth positions must be identified with sufficient particularity to rule out or account for the use of a taxpayer's capital to pay for his purchases. If the end-of-year net worth position is equal to that at the beginning of the year, and if there are no non-taxable sources of income during the year, such as gifts or inheritances, the totality of the year's expenditures reflects total taxable income. If ending net worth shows an increase, the increase reflects an added component of income. If ending net worth shows a diminution, the decrease reduces pro tanto the extent to which expenditures reflect income. [Footnote omitted.] See also United States v. Caserta, 199 F.2d 905, 907↩ (C.A. 3, 1952). 6. The margin for error is demonstrated by the high proportion of deposits that were unidentified as to source: ↩
Year
Unidentified
Total
Deposits
Deposits 1959
$103,052.11
$183,391.53
1960
$212,827.20
$306,305.18
1961
$233,813.91
$341,595.72
1962
$ 97,715.29
$311,362.06
1963
$153,861.71
$260,491.25
7. The testimony of the agent on this point is as follows: Q. * * * Did you attempt to determine whether or not Mr. Jacobs redeposited funds? A. Yes, sir. Q. How did you go about doing that? A. Well, I started out with a list of the cash deposits and I limited my - more or less - examination to amounts over $200. And then I proceded [sic] to go to my check spread for the escrow account and the personal account. And for one or two days before, find out if he had cashed a check on either account. Q. Were you able to locate cash redeposits that way? A. I didn't consider them cash redeposits, I did find checks that could have gone back in as cash deposits. Q. How are they reflected in Respondent's Exhibit R, the deposit spread? A. I think I still have them listed as unidentified cash. ↩
8. The adjustments for "note receivable payments" amounted to $14,713.03 for 1959, $7,200 for 1960, $1,448.30 for 1961, and nothing for 1962 and 1963. ↩
9. The trial record is a trail of confusion. This is due in part, we think, to the fact that petitioner generally did not understand the legal theory underlying respondent's reconstruction of his income. Petitioner's lack of comprehension was evidenced by numerous baseless objections to testimony offered by respondent. On the other hand, although respondent was given full opportunity to demonstrate the method used in reconstructing petitioner's income for each of the years, the sketchy record contains no adequate explanation of what steps, if any, were taken by respondent to keep those determinations within the realm of reason. We infer that some of the confusion as to the escrow accounts is attributable to the fact that James v. United States, 366 U.S. 213 (1961), was decided during the course of the investigation, and that the courts did not decide immediately that pre-James embezzlements are taxable income. See George C. McGee, 61 T.C. 249↩ (1973). 10. The figures taken from schedules attached to the notice of deficiency are as follows: 1959
1960
1961
Unidentified Deposits in Personal, Escrow, and
Trust Accounts Personal
$ 13,571.46
$ 18,658.95
$ 41,764.27
Escrow and Trust
$ 89,480.65
$194,168.25
$192,049.64
Identified Deposits [1] in Escrow and Trust Accounts
Escrow Funds
$ 52,396.49
$ 66,347.54
$ 27,600.00
Other Funds
$ 15,081.29
$ 12,461.23
$ 10,824.36
Withdrawals from Escrow or Trust Accounts
Identified Escrow Payments
$125,998.05
$177,003.14
$122,872.38
Total Escrow and Trust Account Deposits [2] in Excess of Identified Escrow Payments Out of Such Accounts
$ 30,960.38
$ 95,973.85
$107,601.62
[1] and [2] Includes only funds not otherwise accounted for in Exhibit A computation.